The next case this morning is number 5-19-0460, Wells et al. versus State Farm Fire and Casualty Insurance Company. Arguing for the appellants, Wells, is Alfred Sanders. Arguing for the appellee, State Farm, is Joseph Barcheski. Each side will have up to 20 minutes for their argument. The appellant will also have up to five minutes for rebuttal. You'll see the digital timekeeping device on my screen. When time has expired, I'll hit the gavel. And finally, please remember no photographs, and only the clerk of the court is permitted to record these proceedings today. Okay. Are you gentlemen ready to proceed? I am, Your Honor. And Mr. Sanders, if we are having any trouble hearing you, I'm going to raise my hand so that you know. We've been told that there may be something, you know, delays, but I will let you know if I raise my hand. Either I have a question, or we're having trouble with you in that, okay? That would be fine. Thank you. All right. Are the parties ready to proceed? Okay. Mr. Sanders, you may proceed. Thank you, Your Honor. Your Honor, I think it's important to note in the beginning of this that this particular case was bifurcated, that this was not a full trial. This was done because there was concerns about the cost of gathering evidence as to damages, and while there was still a question of liability, the parties agreed, and the judge did, that this would be bifurcated into a question of liability, which is what this hearing was, and if we prevailed, then we would proceed later on the issue of damages. As a result, this particular trial or portion of the trial was simply about whether or not State Farm could prove their affirmative defense that my clients had not done their best to protect the property. So it is important to keep in mind as we proceed that the burden of proof here was on the defendant because they were trying to prove their affirmative defense. Now, in this particular trial, there were only three witnesses. One was William Wells, who was my client, one of the plaintiffs. We put up an expert, and then State Farm put up one of their employees who was in charge of the case at the time, and I say the time, the time of the trial, not the time of this particular event, and that particular person testified that she had never visited the site, never inspected it. There was no evidence that she ever spoke to the plaintiffs. So everything she had was secondhand from a prior investigator, and really and truly, I don't think she added anything to this case. So apparently, it was decided totally based on my client's testimony and our expert. Now, what this case comes down to, and I had it in my reply brief, is that we know there were damages to this building that was caused by flooding. We know the flooding was caused by pipes that froze and bursted. We know that the pipes froze because there wasn't enough heat to prevent the freezing at that time. Do we know why there wasn't enough heat? And the answer to that question is no, we do not. That has been assumed by the trial court, and I think State Farm assumed it from the beginning, but there's no evidence of what the actual heat source was at the time these pipes froze because we don't know exactly when they froze. Mr. Wells testified that the heaters were running, he went by the property, he left the water dripping, which we've all done before, there was no problem, and when he returned two or three days later, the place was flooding, water was spewing everywhere. So when exactly in that time span these pipes froze, we don't really know, and we don't know what was occurring at the time. Now, the standard that we agreed on here was a standard of reasonableness. State Farm had a clause in their policy that said you must do your best to protect the building. What your best is, I think, is a very subjective thing depending on the circumstances. So we need to understand what the circumstances were in order to determine whether they did their best, and we don't really know for sure what the circumstances were. I raised in my brief, and I raised it to the court in my motion to reconsider, and it pointed out to him, to Judge Sanders, that we don't know there was even any power on at this building at the time these pipes froze. If the power went out, the pipes are going to freeze no matter what system you put in, and that was an unknown. Was there a reported power loss during that three days? Nobody presented any evidence either way, and Mr. Brzezinski, and I understand why, says that's speculation, but by the same token, to assume the power is speculation. Certainly the evidence tends to suggest that there was something that went wrong here that should not have gone wrong. Our expert testified, and he came in, and he looked at the heaters, he looked at the plugs, he looked at the breakers, he determined that each heater was plugged into a plug that was on a separate circuit, that each of the circuits should have handled the electrical load. He could not find any problems with anything. He testified as to the wattage of the heaters and how many... Mr. Sanders, but your client testified, if I'm correct, that he had done this, and the three heaters were blowing the circuits. What do you say about that? And that, I think, is something Judge Sanders must have assumed. The circuits had blown back when they were using the furnace, and it was not circuits, it was the circuit on the furnace. And the pipes had frozen a couple of times before because the furnace had failed and tripped a breaker. He had been using the system of space heaters for several years after he had the problems with the furnace, and there had never been a problem with them. I think the furnace, they had a heat pump that was stolen back in 2009, and he testified he had been using these space heaters since before that. So he had been using these space heaters to heat this space of the building for at least three years and never had a problem. The trial court made some comment in the findings that he had used an extension cord because the outlets were not operating properly. That was never testified to. In fact, the expert looked at the outlets and the breakers and the circuits where they were plugged in and said they appeared to be perfectly fine. Didn't find any problem. The electricity wasn't on when your expert came out to look at these circuits, right? That is correct. So how did he know that they were working properly if the electricity wasn't on? Well, he said he found no evidence of a problem. In other words, sometimes when you have a plug that shorts out, burns out, you can have black marks in there, it'll do all sorts of things. But he said he found no evidence that there was, in fact, any problem with any of this. But they have these things that you put into the plugs to test if they're working, right? They have these devices, I don't know what they're called, where you don't have to have the power on. In fact, it's more of a danger to have a power on, right? You can still test. Yeah. And those are to test what they call continuity, to make sure this end of the wire is actually, you've got the two ends. So you plug that in, and it'll tell you this particular wire ends at this part in the breaker box, so you know which breaker it's on. It's called a continuity test. And is that what your expert did? That's what he did. And he testified to that. And he testified that all of those circuits appeared to be, they were separate circuits, they were 20-amp circuits, which was sufficient to handle 1,500 watt heaters. And at the end of the day, he testified that if this had been his property, he would have felt comfortable using this for his own, that he had no issue with it at all. He didn't find any problems with it at all. And there was no contrary evidence that, where my client testified, he'd been using this for years with no problems. So what made this unreasonable at that point in time? And this is where the court made that assumption in, I think it was 5G, was their findings, when the judge said the space heaters were the only heat source at the time the pipes froze. We don't know there was any power on at this building at the time the pipes froze. And we've all probably experienced situations in the wintertime where, you know, a transformer somewhere down the road goes out and the power goes out. It happens all the time. But that was the evidence seemed to suggest that that's what happened. Because the lady that testified for State Farm, her name was Alyssa Midler, they had in their file deep concerns about the fact that there was a, one of these circuits had been blown, had tripped a breaker. There was no evidence of why that happened. She admitted State Farm didn't have a clue why that had happened, and admitted that there was a possibility that the breaker could have been tripped by water spewing onto the plug. And in fact, I asked the expert about that. And, you know, he said, absolutely. If the water was spewing, that could have tripped the breaker. If that's the case, then the damage was already done by the time the breaker tripped, because it means the pipes were already frozen. So this was consistent when he found no other problems with the possibility that what tripped that breaker was spewing water. He testified that the system that my guy put in place should have been sufficient to heat the space. I think there was 400 square feet there, and those three heaters were rated for 450. So the space that we're talking about, is that the only space that contained water pipes? To the best of our knowledge, yes. It was certainly the only place that had birthed it pipes. But the policy says it was your obligation to do the best you could to maintain the building, but it's under the section that talks about pipes. So that's why I was asking, are there any other pipes? Did State Farm ever raise that issue? Not to my knowledge, not to my recollection. They're all concentrated where they come into the building, and I've seen it, where they go overhead, they go into the water heater, and then the bathroom and the kitchen area are right there in rooms right next to each other. So I know when I went out there, I did not see any pipes anywhere else. There's no other bathrooms other than in that space. So when the court in Paragraph 5D said that plaintiffs chose not to heat the entire building, but rather only provided heat to certain rooms that they believed contained water pipes, why is that an issue in this case, or is it?  But if it is, it certainly goes to the question that they were trying to do the best that they could do to identify where the pipes were and make sure that those areas of the building were adequately heated. So, you know, I think when you talk about a person's best, it gets, like I said, it's subjective and depends on the circumstances. And if, in fact, this had been due to a power outage, there's nothing they could have done. Because if they'd had, and I quote Judge Sanders in his final order, denying my motion to reconsider, that he called, blame this on the plaintiff's use of space heaters, knowing there was not an adequate working furnace in the building. Is that going to be the standard this court sets? Because anytime you have a pop, anytime you have pipes freeze, if you don't have a power outage, or maybe even if you do, are we going to set a standard that says you should have seen this coming? You shouldn't have seen a power outage. But that was not the standard we agreed on. The standard was whether it was reasonable given the circumstances and these There was no indication. There was any reason to suspect it wasn't going to work this time. And given the expert's testimony, you know, this is a man with 45 years experience in electrical contractor and HVAC contractor. Is it now unreasonable that what an expert of 45 years said I would have been glad using for my building is now unreasonable because that's basically the decision that we had here. There were other things that I just don't know if judge Sanders was completely paying attention to what was being said, because in five F of his findings, he said, because the outlets did not work properly, it was necessary for plaintiffs to use an extension cord for one or more of the heaters. There was no evidence of any outlets that did not work properly. The only evidence of any breakers previously blowing was the one attached to the furnace, but there was no evidence of any plugs or outlets not working properly. And in fact, the testimony about the extension cord was, and as we all know, most of the time, our outlets in a particular room or on a single circuit, he did not want to plug two of these heaters into the same circuit. So he used an extension cord to make sure that he got to a plug in another room that was on a separate circuit from the others. So, and that was very vivid testimony about why he used that extension cord. I don't understand why judge Sanders thought that he used that because there was a bad outlet somewhere because there was no testimony about that at all. Well, there was some cross-examination by, uh, Mr. Pliszewski, um, about the use of this extension cord and whether it met certain codes and, uh, would you use it for your space heaters? And there was this exchange that went on between, uh, defense counsel and your expert, right? There was. And that was, and in fact, at one point, judge Sanders kind of cut that off because they were trying to present evidence about the fire code. And we didn't have a fire. I guess if we'd had a fire, the spewing water would have probably put it out, but there was not a problem with fire. And in fact, uh, state farms only witness at one point at a deposition. And she admitted this at the trial had testified that she thought the extension cord is what caused the fire. So this is how disconnected she was to the case. She at one point thought this was a fire case. This is the, uh, the woman who testified at trial. Yes. Alyssa Midler. And there was no fire in this case. So the extension cord was only an issue because it possibly might have violated the fire code. But I don't know why that would be an issue since we didn't have a fire. Well, but regardless, um, nobody testified as to whether it was a violation of the code, except Mr. Pliszewski. I mean, he tried to testify to that, but I don't think they called anybody to testify to that. No, they didn't. And, and because, and it was because the judge did cut them off because this wasn't a fire case. I have no question that if this had been a fire case in a place that burned down and somebody said, this is because you used an extension cord, that would have been very relevant. And we probably wouldn't be here at all. But in this particular case, there's no, and in fact, there's no evidence. That was presented that indicated that the breaker that tripped was in fact the one where the extension cord was plugged in. Did State Farm have an, uh, expert come out and look at this? Not to my recollection. They had one of their claims reps come out. Uh, I can't remember his name. It's in the record. Carl. Yes, Carl. Carl Johnson. Yes, Carl Johnson. You're right. And he had come out and I guess he'd written a report that Ms. Midler has had relied on. But like I said, she admitted that they had no idea why this breaker had been. So nobody made their determination. Mr. Sanders in paragraph five I of the order, it says the water damage was discovered at the end of January or 1st of February. Is that true? No, it was discovered. I think it was February the 15th or 18th. I don't recall which, but it was the middle of February. That was another thing I pointed out in my brief that judge Sanders, just the time he's talking about is when the water was turned on, not when the damage was discovered. Your client, I think said there was a two to three day period between the time he last checked and he found the water. That is correct. And was there any testimony about the temperatures within those three days? Mr. Wells tried to testify. I think there was some objections to it, but the night that he went over to check on it was supposed to be the coldest night. That was his understanding. There was no actual evidence presented as to what the temperatures were on each day. I don't see, you know, when I was in my day, we would submit a certified copy of the closest weather report station. Was any exhibit like that ever submitted for that three day period? They were not. So that's why I say, you know, how a person can say you did not do your best without knowing what all the circumstances are. Let's just be honest. When did you think your burden shifted to them? As I understand the burden of proof on an affirmative defense is always on the one presenting the defense. And they agreed that they had the burden of proof at the beginning of this hearing. Okay. So that was why I just don't understand how we got a ruling because I don't know if they think proved that. Okay. Thank you. You'll have a few minutes after Mr. Am I pronouncing that incorrectly, sir? I'll take it. It's but Chesky your honor. No problem. I'm well used to it. I apologize. Mr. Problem whatsoever. You may proceed, sir. Thank you, Mr. Sanders, your honors. May it please the court. As you already know, I represent the defendant amply in this case, state farm fire and casualty insurance company. And it is our position that the lower court has not their decision was not against the manifest weight of the evidence, which is the appropriate standard of review here. And we're asking that the lower courts decision be affirmed. And there's two main points that I would like to advance here today. Number one. I believe the court used the appropriate standard of reasonableness in this case, which is, is what the parties agreed to. And number two, there was sufficient evidence within the record for the court to determine that the plaintiffs had not done their best to heat their building because they had not acted reasonably under the circumstances by heating it with three space heaters in the dead of winter. Now, in terms of the facts, there are a couple of things I would like to point out before I talk about some of the facts that I wanted to present, because I think some of the information that was just conveyed to the court is patently incorrect. For one, Mr. Sanders pointed out that there was no evidence that there were any pipes in any other area of the building, which is just not true. If we look at pages 102 and 103 of the record of proceedings, there was a discussion with Mr. Castellano about the fact that there was a back bathroom in the building where there were no space heaters placed, where there were water pipes that were on an exterior wall. Now, I don't think that that really, that's really not a material issue in the case, and I don't plan on making that part of my, a material part of my argument, but I think it's, it's important for the court to really know the truth there. Well, wait a minute here. You know, I was asking about water pipes, and now you're telling me there was a bathroom pipe. Was that even mentioned by you? I saw that in your cross-examination of the expert, but as far as your affirmative defense in heating, doing your best to maintain the building, did you include that as a part of your proof? Well, it was part of the cross-exam, Your Honor, and it's our position that, and the reason that I didn't call Mr. case within the cross-exam, and there's plenty of law in Illinois that suggests that you don't need to call your own witnesses if you can meet your burden of proof with information obtained on cross. I agree with that proposition of law, but that wasn't really my question. Well, I apologize, Your Honor. My question, it seems from the record, at least, that you and everybody else, including the court, focused on this area that you drew on the diagram when you had the expert put the checkbox and everything. You focused on this approximately 400 to 450-foot, square-foot area as far as maintenance of the space. Correct. And now the bathroom that you've just described, is that outside the area that we're talking about? It is, Your Honor, and that's why I wanted to point out, I don't think it's material to this court's decision, but I did want to point out that what Mr. Sanders just represented to the court was not true, and that's why I wanted to bring that up. Okay. And we're going to, Mr. Bochesky, we're going to use some civility here about our language, but I want to ask what's material. I want to stay within the 400 and 450, whatever the diagram was, if you would, because I think that's where the best maintenance issue comes out, or am I wrong? No, I think you're right, Judge, and I apologize for that. I just wanted to make sure that we had a clear understanding. The key facts to this case are when the water had been shut off in this building for two years, there had been, in essence, the building was vacant, and it was only used prior for Mr. Wells' law practice, before in 2009 he was no longer practicing, and then in two years they didn't use it other than to store files. There was no running water and no power in the building, yet in January, late January of 2011, they decide they're going to turn the water on in the building in the coldest part of the year, only because their son needs to come there At that time, now, Mr. Sanders has talked a little bit about this furnace and how it wasn't dependable, but part of the testimony of Mr. Wells on cross-exam was that it was tripping breakers around the area where the furnace was located. He did not know whether it was the furnace itself or whether it was some of the other outlets around that area where eventually there were space heaters plugged in. Now, State Farm obviously denied this under the language of the policy of not doing their best to maintain heat in the building. And the main issue there, Your Honors, and the reason that we think that the judge applied the appropriate standard is because we agreed to it. The standard was reasonableness, and there was no specific Illinois cases on point on this issue, and that's why we looked to some other jurisdictions, and including the Western District of Arkansas has the case called Son Rob vs. Lafayette Insurance Company, which we've cited in our brief. And in Son Rob, the issue was whether or not a hotel, using what they called a cross-heating system, had done their best. And the court pointed out that even when you construe the language against the insurer, it still requires a reasonableness standard and good faith and sound business judgment. And in this case, the evidence established that that just was not what took place. And what I would like to focus on, too, is the fact that under the manifest weight of evidence standard, Judge Sanders' decision either needs to be arbitrary, contrary to the evidence, or that it's obvious that another conclusion should have been reached, and that's just not the case in this situation. For one, and kind of jumping back to where we've met our burden of proof with the facts in this case, it was met, one, with William Wells' testimony, and two, with Mr. Castellano's testimony. Now let's start with William Wells. He admits that he's had issues in the past with pipes freezing in this very same building. He admits that there was... And what year was that? He said it was three separate times in the past. I don't think he recalled exactly. Okay, thank you. You're welcome, Your Honor. The other issue was there was a heating pump system that was working in conjunction with a furnace. That was the original design of the heat system. And the heat pump had been stolen, and they never replaced it. Then the furnace, he admits it was not dependable, it was not working, and he never checked to see whether it was working at the time, even though there were these other opportunities for that heating to be used. Now... So, Mr. Brzeski, why is the furnace so important if you can adequately heat, hypothetically, assume hypothetically you can adequately heat the 450 square feet of space with three space heaters? Why is the furnace even important then? Well, I would say two reasons. For one, Mr. Castellano himself admitted that it is not reasonable to use space heaters long-term to heat a building. And in fact, in his testimony, when I asked him on cross-examination, he said it's not the best, and no, it was not reasonable to use them long-term. That's really the issue here. But what – are you saying three days is long-term? Actually, he said more than a couple days would be long-term, and their plan was to use this for basically heat for the entire winter. And that's just not reasonable, and Castellano admitted that. And in fact, even though he said – Where did Castellano admit that? I didn't see that. It's on page R112 of the record, Your Honor. Okay. And I asked him a question, in your opinion, it's not reasonable to use space heaters long-term to heat a building? Answer, it's not the best. He actually uses the word the best, no. And I said, you'd agree with me, and he says, answer, yes. Plaintiff has never responded to that testimony. The other issue, too, is even though Castellano has said that he would have heated his own building or felt comfortable doing it, he admitted that in 40 years as a construction contractor, he had never, ever used space heaters for more than a day or two. And we know just from Mr. Wells' testimony alone, he had these heaters in place for over 15 days. And now the other issue there is counsel has mentioned – I'm still not sure, though, if he had it for over 15 days and there was no freezing of the pipes. Isn't that really against you as far as whether you're doing your best to maintain when you have a furnace that you know is breaking up the circuits? What do you want him to do to maintain the building other than try to keep the pipes warm with space heaters? What options would there have been? Well, first off, I should say that his testimony was actually – and then found the leak on the 15th. But our contention would be to have a permanent heat source, either a furnace or something that's designed to heat a building on a permanent basis, not three space heaters, that even in Mr. Castellano's opinion, three of them could heat 450 square foot. But if just one space heater trips a breaker, it only heats 300 square foot, which is less than the area that they need to heat. And that's what happened in this case. Well, how do you know that's what happened? Well, Mr. Wells admitted that after the fact, he found one of the breakers tripped. Do you know what caused – I'm sorry. Do you know what caused the trip, whether it was the water? Which came first, the chicken or the egg kind of thing? Did the water cause the trip, or did the breaker go out? Well, first off, no, we don't know. But as we cited in our brief, the case of U.S. minerals versus licensed processors, any doubts about the facts are resolved in favor of the appellee. And it's presumed in a bench trial that Judge Sanders reviewed all the evidence he needed to make this decision. But first off, okay, let's look at both scenarios. I want to ask this question. What evidence is reviewed in favor of the appellee? What's that statement you made? I don't understand it. In the case U.S. minerals versus licensed processors, Your Honor, which we cited, which is at 194 LAPP 3rd 428, it talks about an incomplete record or any doubts arising from incomplete facts in the record are resolved against the appellant. And those issues which depend for resolution upon facts not in the record mandate affirmance. Okay, you're talking about things that are not in the record, but it was your burden here to prove that he did not do his best to maintain. That's correct. I want to ask you, before your time runs out, I want to ask you about a business record that you admitted with the team manager, whatever her title was at the time. There was an inspection done by this individual, Carl Johnson, and I'm looking at E27 of the record, where he did a supplemental inspection and went to the building and he saw the space heaters and he noted that there were three thermometers on, one showing 68, one in the bathroom showing 68, one showing 71, and the outside temperature was approximately 40. If your own insurance adjuster found that to be true, why wouldn't you have called him to the stand to talk about best maintaining of the building? I mean, he did his own inspection. The plaintiff put the space heaters on. In fact, I think your insurance investigator noted that one of the space heaters that was broken  but is there any reason to refute what your own insurance adjuster found in the record? Well, Your Honor, for one, he did not testify and I don't think that those facts were ever analyzed by the plaintiff in their brief or any arguments made about that. But at the same time, to answer your question directly, the reason we didn't call Mr. Johnson is he's moved on to a different company and he was out of the area and we didn't have the ability to get him there. I mean, I guess I could have subpoenaed him. Oh, I understand. But he's no longer with the company. But you agree that because plaintiff stipulated, and I think you introduced the foundational testimony that this was indeed a business record, it was made at the time, et cetera, et cetera, I saw that in the record. You agree that this information is in the record. You didn't call this individual, take his deposition, or do anything. But this information, nevertheless, is to be or can be considered by this court because we can affirm or deny or do whatever we want on information contained in the record, right? That is true, Your Honor, but under the manifest way to the evidence standard, I don't think that in of itself would show that Judge Sanders' decision was arbitrary, and I don't think that that comment by Mr. Johnson would be completely inconsistent with our position other than we didn't have him explain that further at trial. I don't think that creates a situation to where Judge Sanders has ignored anything. What concerns me, Mr. Brzezinski, is you did a lot of testifying at trial in your cross-examination. You were quite adept at it. I have to compliment you on that. You know, you asked questions about, isn't it true the National Fire Code says this? Isn't it true that the space heater recommendations are this? But you never followed up your cross-examination or your attempt at impeaching the credibility of their expert with your own factual testimony, and I think the case law is still that if you make such suggestions but don't follow it up with your own witnesses, then we are not to consider the cross-examination as evidence. Isn't that still the rule? I'm not aware of that rule, Your Honor, unless there be something that contradicts. And now the fire protection issue, the judge did sustain the objection on those issues, and the main reason I was trying to go there was just to suggest that as a whole, in the industry, space heaters are not something that anyone views as a long-term heating solution. It's one thing for a few days, but to keep it in your building in the dead of winter as the sole source of heat is just simply not reasonable. That's my point, Mr. Vyshevsky. I know what you wanted to prove, but unless a witness agrees with you, when you ask the question, isn't it true that an extension cord should not be used, I think he said, well, it depends upon the size of the extension cord and what you're trying to plug in. So you really never got what you were looking for, I think, but you never told anybody to say, well, you shouldn't do it this way. I agree, Your Honor, and the extension cord issue, when the judge sustained that, there was no reason for me to go there anyway, and the other issue with the extension cord that we're not really looking at here is Mr. Castellano's examination. He didn't even know that the heaters were plugged into an extension cord. In fact, at page R90 of the record, he admits that Mr. Wells didn't give him all the information, didn't tell him one was plugged in with an extension cord, so he didn't even examine the outlet where that heater was plugged in. If I recall that page, because I was kind of chuckling about that page, the way you asked the question, I think his answer was that the wife didn't tell him. I don't know that you asked whether he was actually told that by the plaintiff, and if I'm wrong on that, but I do remember that he said the wife didn't tell him that, because, again, you were trying to get at his credibility, although I'm not sure why that mattered, whether there was an extension cord or not, as long as he was putting it into a different outlet. All I'm saying here is it was your burden to prove that he didn't do the best to maintain, and that's why I'm asking these questions. I don't understand why you didn't call somebody to talk about what you wanted them to talk about. Well, like I said, Your Honor, when they make the admissions that you need, including the key thing, Mr. Castellano admitting it was not the best, it was not reasonable, Mr. Castellano admitting he would have never or has never in 40 years done this in his building, Mr. Wells admitting that these circuits weren't working properly, the furnace wasn't working properly, the fact that they did this in the dead of winter, the totality of the circumstances, why did they even need to have the water? I mean, the whole picture just smells of why, you know, and why could – they didn't even need it when the adults would go, I'm sorry, I see that my time is up now. Well, Justice Boyd, do you have any questions? I don't. Justice Moore? No. Okay, thank you, Mr. Bichesky. If I've butchered your name again, I apologize. That's absolutely not a problem. Thank you, Your Honor. We understand your – Thank you very much. Yes, sir. Thank you. Mr. Sanders? Yes, Your Honor, thank you. Just to clarify a few facts here, when I said there was no other pipes in the building, when I said I think I said I wasn't aware of it. It may have been discussed at some point, like yourself, Justice Cates, they weren't considered material because apparently those pipes didn't break. All the damage was in this one area where the space heaters were. So nobody ever considered the material, and there may have been another one that I don't recall. I'm working from memory on that, but they weren't material at the time, and I don't think they're material today. In addition, Mr. Bichesky said this building had not been used for two years. I don't believe that's what was testified to. Mr. Wells was no longer practicing law, but he was working with credit counseling for bankruptcy people, and I believe his testimony was that they kept their files in that building, that him and his wife would come in there. She helped him, that they would come in there and work a couple of hours at a time, maybe once or twice a week. So this building was not like it was abandoned. They were using it on a regular basis, but it wasn't a law practice anymore. Well, the issue is really whether the water had been turned on, and I don't think— I recall the testimony, they turned the water on so the son could use the bathroom. That was really the only reason for it. He was going to do some remodeling or something. That is correct, and the water had been off because they didn't really use the building a lot, but they did use it, so it's not like it was just sitting there for two years. And yes, it was turned back on for the son because he was doing some construction. The idea that the furnace was tripping breakers in the area, I don't recall that testimony, and it would fly in the face of everything. I don't know. I mean, I was a building contractor for 13 years before I became an attorney. If you have some kind of electrical device, be it a furnace or space heater or whatever, and there's a problem, it's going to trip the breaker it's attached to. I've never heard of a device tripping other breakers other than the one it's attached to. So the idea that the furnace was tripping outlets, there was no testimony about that, and maybe that's where the judge got confused. Judge Sanders got confused and thought that the furnace was tripping other breakers. I don't even think that's possible. But it's important to remember that when the prior freezing took place, the two or three times that he testified to, that was when they were not using space heaters. That's when they had a heat pump and a furnace, and it was the heat pump and furnace that had been inadequate to keep the pipes from freezing. So he had used these space heaters as an alternative to something he had known failed. So how that could be, and he did it for several years successfully. Do you think that the burden here is the best you can do under the circumstances, or the best meaning the best perfection? I don't really think it's either one. I think if it's simply reasonable, there's always a better way to do something. So the idea that it's the best, I don't think even comes close. I think the question is, was this reasonable given the circumstances, given the past, the fact that this had been used in the past, it had worked in the past, there had never been a problem with this system? An expert that says this should have been sufficient, sufficient enough that I would have been willing to use it if it was my own building. How can one come to the conclusion that that's unreasonable? Because that's exactly what the standard was, reasonableness. If they win, it means Judge Sanders had to find that what my client did was unreasonable. And given the circumstances of the past, how could this possibly have been unreasonable? Given the expert testimony of Mr. Castellano, and the three or four years he had been using this successfully, what all of a sudden made this unreasonable? And I was just, to be honest, completely dumbfounded when I saw the decision, because I'm like, there's no evidence of any such thing. So we'd ask you to reverse the trial court's decision and send it back. Thank you. Thank you both, gentlemen. We appreciate the arguments of counsel. The matter will be taken under advisement, and we will issue an order in due course. Have a great day. Thank you both. Thank you. Thank you, gentlemen.